**Kristie A. BENNETT, Individually and as the Executrix of the Estate of John M. Bennett, Jr., Deceased, Appellant–Plaintiff,**

v.

**CROWNLIFE INSURANCE CO., An Alabama Domicile Insurer, and Solidarity Federal Credit Union, An Indiana Corporation, Appellees–Defendants.**

No. 80A02–0204–CV–294.

Court of Appeals of Indiana.

Oct. 29, 2002.

George G. Ponton, Ponton & Mohler, Frankfort, IN, for Appellant.

Eric D. Johnson, Kightlinger & Gray, Indianapolis, IN, for Appellee.

## OPINION

SHARPNACK, Judge.

Kristie A. Bennett, individually and as executrix of the Estate of John M. Bennett, Jr., ("Bennett"), appeals the trial court's grant of summary judgment to CrownLife Insurance Company ("Crown-

Life"). Bennett raises four issues, which we consolidate [1] and restate as follows:

I. Whether the trial court erred by applying Indiana law; and

II. Whether the trial court erred by granting summary judgment to CrownLife;

We affirm.

The facts most favorable to Bennett follow. On September 16, 1997, John Bennett, Jr., ("John") saw Dr. William F. Fechtman complaining that his speech had been slurred for the past three weeks and that he had "fullness" in his left ear. Appellant's Appendix at 74. Dr. Fechtman diagnosed John with an impacted cerumen, bilateral high tone neurosensory hearing loss, and a speech disorder. Dr. Fechtman told John that he wanted to talk to him again in one month regarding his speech. Dr. Fechtman was concerned that John might be "having an early presentation of demyelinating disease" although he did not inform John of this possibility. *Id.* at 74.

On October 14, 1997, John returned to see Dr. Fechtman. At that time, John reported that, in addition to the slurred speech, he was having some difficulty swallowing liquids and solids. Dr. Fechtman diagnosed John with dysphasia and slurred speech and referred him to a neurologist. Dr. Fechtman did not inform John that he had multiple sclerosis or amyotrophic lateral sclerosis "because of the seriousness of both diseases." *Id.* at 55.

On October 15, 1997, John submitted a "Member Enrollment Form" to CrownLife for group term life insurance in the amount of $100,000.00. *Id.* at 177. The enrollment form contained the following questions:

1. Have you ever had or been treated for heart trouble, high blood pressure, ulcerative colitis, kidney disorder, diabetes, any mental or nervous disorder, alcoholism, lung disorder, cancer or tumors?

\* \* \* \* \*

4. Have you currently, or during the last 5 years, consulted a physician or received treatment for any disease, ailment, injury, or mental disorder not included in question 1?

*Id.* John responded "no" to question 1 and "yes" to question 4. As an explanation for question 4, John responded that he had a discectomy in April of 1997. The enrollment form further required John to "declare that all statements and answers in this application and any questionnaire or declaration of Insurability completed in connection with this application are, to the best of my knowledge and belief, true; and agree that they shall form part of the policy." *Id.*

On November 7, 1997, John was seen by a neurologist, Dr. Jon Finley. Dr. Finley ordered testing and requested that John see a "neuromuscular specialist at the Muscular Dystrophy Association Clinic." *Id.* at 77. A few days later, John responded to a request for additional information from CrownLife and provided details on his discectomy. John signed the additional information questionnaire, which provided that "I understand that any material misstatement in this questionnaire, or elsewhere in my application for insurance, will permit the Company to decline my applica-

---

1. Bennett also argues that "the questions on the insurance application are ambiguous and would lead an applicant astray," and that the trial court abused its discretion by granting CrownLife's motion to strike two affidavits submitted by Bennett. Appellant's Brief at 1. We consider these questions in our discussion of whether the trial court erred by granting summary judgment to CrownLife.

tion or rescind my coverage." *Id.* at 178. John had further evaluations of his medical problems on December 1, 1997, and was diagnosed with early primary bulbar motor neuron disease.[2] After receiving the additional medical information from John, CrownLife issued a policy of life insurance to John effective January 1, 1998.

John died on November 16, 1999, of amyotrophic lateral sclerosis ("ALS"), also known as Lou Gehrig's disease.[3] Bennett filed a claim for John's life insurance benefits and authorized CrownLife to obtain John's medical information. However, CrownLife denied Bennett's claim for the life insurance benefits. Bennett filed this action against CrownLife and Solidarity Federal Credit Union alleging that her claim for the life insurance benefits was wrongfully denied. CrownLife filed a "counterclaim" requesting that the insurance be declared "rescinded and void" due to misstatements on John's enrollment form. *Id.* at 200. CrownLife also filed a

motion for summary judgment, which the trial court granted.[4]

## I.

■ The first issue is whether the trial court erred by applying Indiana law. On appeal, Bennett argues that the policy contains a choice of law provision requiring the application of Alabama law to the issues of this case. CrownLife argues that Bennett waived application of Alabama law.

■ Choice of law issues may be waived if not properly raised. *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 146 (Ind. 1999). Under the Uniform Judicial Notice of Foreign Law Act, a party may raise a choice of law issue and may inform the trial court of the law of other states by offering evidence of such law or by asking the trial court to take judicial notice of such law. *Id.*; see also Ind.Code § 34–38–4–4 (1999).[5] "Providing the trial court

2. Motor neuron disease is defined as:
 a group of severe disorders of the nervous system characterized by progressive degeneration of motor neurons (neurons are the basic nerve cells that combine to form nerves). Motor neurons control the behavior of muscles. Motor Neuron Diseases may affect the upper motor neurons, nerves that lead from the brain to the medulla (a part of the brain stem) or to the spinal cord, or the lower motor neurons, nerves that lead from the spinal cord to the muscles of the body, or both. Spasms and exaggerated reflexes indicate damage to the upper motor neurons. A progressive wasting (atrophy) and weakness of muscles that have lost their nerve supply indicate damage to the lower motor neurons.
 WebMD, *Motor Neuron Disease*, at http://my.webmd.com/encyclopedia/article/4115.284 (last visited Oct. 3, 2002).

3. ALS is a "progressive wasting away of certain nerve cells of the brain and spinal column called motor neurons. The motor neurons control the voluntary muscles, which are the muscles that allow movement. Over a period of months or years, ALS causes in-

creasing muscle weakness, inability to control movement, and problems with speaking, swallowing, and breathing." WebMD, *Amyotrophic Lateral Sclerosis - Topic Overview*, at http://my.webmd.com/encyclopedia/article/4115.20298 (last visited Oct. 3, 2002).

4. Solidarity Federal Credit Union was not a party to the summary judgment motion. However, in ruling on CrownLife's motion for summary judgment, the trial court expressly found "no reason for delay in the entry of judgment" as to the claims involving Crown-Life. Appellant's Appendix at 10. Thus, the judgment is an appealable final judgment pursuant to Ind. Appellate Rule 2(H).

5. Ind.Code § 34–38–4–1 provides that "[e]very court in Indiana shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States." Ind.Code § 34–38–4–4 provides further that "[a]ny party may also present to the trial court any admissible evidence of such laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken of the

with notice of the foreign law allows the court to consider whether the other state's or Indiana's law should apply." *Id.* A prerequisite to informing the trial court of another state's law, however, is that "reasonable notice shall be given to the adverse parties, either in the pleadings or otherwise." *Id.* (quoting I.C. § 34–38–4–4). "In the absence of such notice to the adverse party or to the trial court, the court 'will presume the law in that [other] jurisdiction is substantially the same as the law in Indiana.'" *Id.* (quoting *Harvest Ins. Agency, Inc. v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 691 (Ind.1986)).

Here, our review of the record reveals no request from Bennett that the trial court apply Alabama law to the issues of this case. In fact, Bennett argued in her summary judgment brief that "the law of Alabama and Indiana is very similar, if not the same, and that under the law of either jurisdiction, Plaintiff is entitled to a jury trial...." Appellant's Appendix at 136. Bennett then cited both Indiana and Alabama law as authority. The trial court entered a general judgment and did not specify whether it applied the pertinent law of Indiana or Alabama. Bennett may not argue to the trial court that Alabama law and Indiana law are "very similar, if not the same" and then argue on appeal that Alabama law is different than Indiana law and that the trial court erred by applying Indiana law. *See, e.g., Holland v. Miami Sys., Inc.,* 624 N.E.2d 478, 482 (Ind.Ct.App.1993) (holding that the trial court properly applied Indiana law where a party did not request the trial court to apply Ohio law), *trans. denied.* Thus, we apply Indiana law to the substantive issues of this case. See, e.g., *id.*

## II.

The next issue is whether the trial court erred by granting summary judgment to CrownLife. Our standard of review for the grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.,* 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.* Review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on a summary judgment motion to ensure that a party was not improperly denied its day in court. *Id.* at 974. Additionally, when material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. *Burkett v. Am. Family Ins. Group,* 737 N.E.2d 447, 452 (Ind.Ct. App.2000). "When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter de novo." *Id.*

Bennett argues that the enrollment form was ambiguous and that a genuine issue of material fact exists regarding "what John was supposed to disclose on his application." Appellant's Brief at 21. CrownLife counters that the enrollment form questions were unambiguous and John made a material misrepresentation by failing to disclose his September 16, 1997 and October 14, 1997 appointments with Dr. Fechtman.

evidence, reasonable notice shall be given to the adverse parties, either in the pleadings or

otherwise."

Initially, we must determine whether the enrollment form questions were ambiguous. Our supreme court recently discussed the rules of construction for insurance policies. *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind.2002), *reh'g denied.*

> Although some "special rules of construction of insurance contracts have been developed due to the disparity in bargaining power between insurers and [insureds], if a contract is clear and unambiguous, the language therein must be given its plain meaning." On the other hand, " [w]here there is ambiguity, insurance policies are to be construed strictly against the insurer' and the policy language is viewed from the standpoint of the insured." A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. In insurance policies, "an ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party."

*Id.* (internal citations omitted). Moreover, the proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment. *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 243 (Ind.2000).

■ In the present case, the enrollment form contained various questions regarding John's health, including the following questions:

1. Have you ever had or been treated for heart trouble, high blood pressure, ulcerative colitis, kidney disorder, diabetes, any mental or nervous disorder, alcoholism, lung disorder, cancer or tumors?

\* \* \* \* \*

4. Have you currently, or during the last 5 years, consulted a physician or received treatment for any disease, ailment, injury, or mental disorder not included in question 1?

Appellant's Appendix at 177. The enrollment form further required John to "declare that all statements and answers in this application and any questionnaire or declaration of Insurability completed in connection with this application are, to the best of my knowledge and belief, true; and agree that they shall form part of the policy." *Id.*

Bennett argues that John "understood the questions in conjunction to be asking for what he was actually treated for rather than what conditions and ailments he possibly had." Appellant's Brief at 21. We disagree. Rather, the first question clearly asks whether the applicant has ever had or been treated for certain specific illnesses. Question 4 is a "catch all" provision that asks whether the insured has consulted a physician or received treatment for any disease, ailment, injury or mental disorder not listed by the applicant in Question 1. We conclude that reasonable persons would not differ as to the meaning of the questions on the enrollment form.

■ Having determined that the questions on the enrollment form are not ambiguous, we must determine whether John made material misrepresentations when completing the enrollment form that would entitle CrownLife to void the policy. "False representations concerning a material fact, which mislead, will void an insurance contract, just as any other contract, regardless of whether the misrepresentation was innocently made or made with a fraudulent intent." *Primerica Life Ins. Co. v. Skinner*, 678 N.E.2d 1140, 1142 (Ind. Ct.App.1997). We have held that a representation is material "if the fact omitted or

misstated, if truly stated, might reasonably influence the insurer's decision whether to issue the policy or to charge a higher premium." *Id.* Normally, the materiality of a misrepresentation is a question of fact for the jury. *Watson v. Golden Rule Ins. Co.,* 564 N.E.2d 302, 306 (Ind.Ct.App. 1990). However, the materiality may be determined as a matter of law if the evidence is such that there can be no reasonable difference of opinion. *Id.*

Bennett relies upon *Jesse v. Am. Cmty. Mutual Ins. Co.,* 725 N.E.2d 420 (Ind.Ct. App.2000), *trans. denied.* In *Jesse,* the insured applied for health insurance and filled out an application containing the following question:

> Have you been examined, advised or treated by any physician, therapist, psychologist, chiropractor, or other practitioner or been hospitalized for any reason within the last ten years?

*Id.* at 424. Jesse had been advised that she had a "functional murmur" and asked the insurance agent whether that fact should be included in responding to the question. *Id.* at 422. The insurance agent asked whether Jesse had ever been treated or prescribed medication for the condition, and Jesse responded that she had not received treatment or medication. *Id.* The insurance agent advised Jesse that "it was not necessary to note the functional murmur on the form." *Id.* Thus, Jesse answered "yes" to the question and noted that she had received "routine exams." *Id.* at 424. Jesse was issued a health insurance policy based upon the application. *Id.* at 422. However, when Jesse had an aortic valve replacement surgery a few months later, the insurance company denied her claim on the grounds that Jesse had failed to disclose her functional murmur on the application. *Id.* Jesse filed a complaint against the insurer, and the trial court granted summary judgment to the insurer. *Id.*

We held that while there was no genuine issue that Jesse's failure to disclose the murmur was "material," a genuine issue existed as to whether Jesse made a misrepresentation. *Id.* at 423–425. Specifically, we held that "viewing the facts most favorable to Jesse, it is entirely plausible that question 7(B) could be interpreted to require disclosure of only those conditions for which the applicant had received specific medical treatment or had been advised to seek specific medical services." *Id.* at 425. Thus, we held that the trial court erred by granting summary judgment to the insurer. *Id.*

However, this case is distinguishable from *Jesse.* Here, John saw Dr. Fechtman on September 16, 1997, complaining that his speech had been slurred for the past three weeks and he had "fullness" in his left ear. Appellant's Appendix at 74. John returned to Dr. Fechtman on October 14, 1997. At that time, John reported that, in addition to the slurred speech, he was having some difficulty swallowing liquids and solids. Dr. Fechtman referred John to a neurologist.

The enrollment form first questions whether John had or had been treated for "heart trouble, high blood pressure, ulcerative colitis, kidney disorder, diabetes, any mental or nervous disorder, alcoholism, lung disorder, cancer or tumors." Appellant's Appendix at 177. Although ALS would fall under the category of a nervous disorder, the parties do not dispute that, at that time, John was unaware that he might have ALS. Thus, John was correct in answering question 1 with "no."

 Rather, CrownLife argues that John made a misrepresentation by failing to disclose under question 4 that he had consulted with a physician on September 16, 1997, and October 14, 1997. Unlike the

applicant in *Jesse*, under the clear language of question 4 on the enrollment form, John was required to disclose if he had "currently, or during the last 5 years, consulted a physician or received treatment for any disease, ailment, injury, or mental disorder not included in question 1." *Id.* Ailment is defined as "indisposition of body or mind; a slight illness.... In life insurance application, [the] term does not include mere temporary indisposition, which though requiring medical treatment is readily remediable, ... nor passing disorders which could not properly be called diseases." *Black's Law Dictionary* 69 (6th ed.1990). John's conditions were not a "mere temporary indisposition." Rather, he had been complaining of slurred speech and hearing loss for several weeks. He had also developed trouble swallowing and had been referred to a neurologist. Thus, his medical problems qualified as an ailment. Moreover, he had "consulted" with a doctor for the problems. John made a misrepresentation by failing to disclose that he had recently consulted with a physician for various ailments, specifically slurred speech, hearing loss, and trouble swallowing.[6]

As previously noted, a representation is material "if the fact omitted or misstated, if truly stated, might reasonably influence the insurer's decision whether to issue the policy or to charge a higher premium." *Primerica*, 678 N.E.2d at 1142. CrownLife designated evidence that had it known of John's two appointments with Dr. Fechtman, it would not have issued the insurance policy to John effective January 1, 1998. Rather, CrownLife would have conducted further investigations "ultimately leading to the denial of the application." Appellant's Appendix at 175. We conclude that there can be no reasonable difference of opinion that John's omissions on the enrollment form could reasonably have influenced CrownLife's determination to issue life insurance to John. *See, e.g., Primerica*, 678 N.E.2d at 1142 ("We conclude as a matter of law that there can be no reasonable difference of opinion that the uncontroverted facts establish a material misrepresentation by Clinton in his insurance application.").

John made a material misrepresentation on the enrollment form which voided the insurance policy. No genuine issues of material fact exist, and CrownLife is entitled to judgment as a matter of law on Bennett's complaint. Thus, the trial court did not err by granting CrownLife's motion for summary judgment. *See, e.g., Ruhlig v. Am. Cmty. Mut. Ins. Co.*, 696 N.E.2d 877, 881 (Ind.Ct.App.1998) (holding that the trial court did not err by granting

6. Bennett also argues that the trial court abused its discretion by striking her affidavit and the affidavit of Phil Shanks which were submitted in opposition to CrownLife's motion for summary judgment. Bennett's affidavit described John's reactions after his various doctor visits and the fact that he was unaware that he had ALS until December 1, 1997. Shanks's affidavit contains several opinions, including that the questions on the enrollment form are "ambiguous and confusing" and that John "was trying to answer the medical questions in the CrownLife application truthfully but based on the ambiguous and confusing manner in which the questions were worded was probably mislead and thought he only needed to report conditions which were life threatening and for which he had received treatment." Appellant's Appendix at 54. We have held that the questions on the enrollment form were not ambiguous and that, in response to question 4, John was required to report his September 16, 1997 and October 14, 1997 doctor's appointments on the enrollment form. Even assuming arguendo that the trial court abused its discretion by striking the two affidavits, nothing in the two affidavits creates a genuine issue of material fact. Thus, we need not address Bennett's argument regarding the two affidavits.

summary judgment where the insured omitted diseases from which she suffered when completing a health insurance application).

For the foregoing reasons, we affirm the trial court's grant of summary judgment to CrownLife.

Affirmed.

FRIEDLANDER and NAJAM, JJ., concur.